UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

ELIJAH SCHIMKEWITSCH,

                        Plaintiff,                19-cv-5199 (GRB)(LGD)

      -against-

                                        **STATEMENT PURSUANT TO LOCAL**

NEW YORK INSTITUTE OF TECHNOLOGY,   **CIVIL RULE 56.1**

                        Defendant.

---------------------------------------------------------------x

Defendant New York Institute of Technology ("NYIT" or "Defendant") as and for its statement of material facts as to which there is no genuine issue to be tried, pursuant to Rule 56.1 of the Local Rules of this Court, alleges as follows:

## I.    <u>NYIT'S PHYSICIAN ASSISTANT STUDIES PROGRAM</u>

### A.    **Background Concerning NYIT and the Program**

1.    NYIT is a private not-for-profit institution of higher education. (Answer, ¶6).

2.    NYIT maintains two New York campuses, one in Manhattan and one in Old Westbury. (Answer, ¶6).

3.    NYIT offers a graduate Physician Assistant Studies program (the "Program") to students. (Amended Complaint, ¶9).

4.    The Program is only offered out of NYIT's Old Westbury campus. (Ahmed[1] 5:12-17).

---

[1] References are to the deposition transcript of Zehra Ahmed.

5.     NYIT provides to students in the Program a Physician Assistant Studies Student Handbook ("Student Handbook") upon matriculating into the Program. (Ahmed 61:21-25, 67:9-68:10; Toren Aff.[2], Ex. A [NYIT956-1038]).

6.     During orientation, the contents of the Student Handbook are discussed with the incoming Program class, including the Program's professional conduct policy. (Ahmed 67:14-70:25; Toren Aff., Ex. A [NYIT956-1038]).

**B.     Plaintiff's Enrollment at NYIT**

7.     Plaintiff earned an undergraduate degree from NYIT in May 2016. (P. 23:2-16).

8.     Plaintiff never requested an accommodation from NYIT for any alleged disability when he attended NYIT as an undergraduate. (P.[3] 23:19-23:2).

9.     Plaintiff commenced his studies in the Program in September 2016. (P. 25:22-25).

10.     On or about September 6, 2016, Plaintiff acknowledged that he read and understood the contents of the Student Handbook. (Ahmed 67:14-70:25; Toren Ex. B [NYIT2109]).

11.     During Plaintiff's time as a student in the Program, Dr. Zehra Ahmed ("Ahmed"), was Associate Professor and Chair of the Program. (P. 48:9-17; Ahmed 14:18-23, 15:17-21).

## II.     PLAINTIFF'S FIRST YEAR IN THE PROGRAM

**A.     Office of Campus Life Complaint**

12.     By letter, dated February 17, 2017, NYIT's Office of Campus Life notified Plaintiff about complaints made by two female students who accused Plaintiff of making

---

[2] References are to the Affirmation of Stefanie Toren.

[3] References are to the deposition transcript of Plaintiff.

inappropriate comments and engaging in inappropriate behaviors directed toward female students in the Program. (Pl. Dep. Ex. A[4]; P. 28:7-30:13).

13.     NYIT's Office of Campus Life directed Plaintiff to refrain from all contact with the two female students. (Pl. Dep. Ex. A; P. 30:6-9).

14.     To comply with the requirement that Plaintiff refrain from contact with the complaining students, Plaintiff's class desk location was moved. (P. 207:9-21).

15.     Plaintiff contends that this new class desk location made it more difficult for him to hear based on his tinnitus condition. (P. 207:17-25).

16.     Plaintiff made a request to Ahmed that his seat be moved closer to the front of the class. (P. 208:2-4).

17.     Plaintiff's request was granted. (P. 208:2-209:9).

18.     NYIT investigated the allegations made by the two students. (Pl. Dep. Ex. A; P. 30:2-33:12).

19.     NYIT concluded its investigation and declined to formally charge Plaintiff with a violation of NYIT's Student Code of Conduct. (P. Dep. Ex. B; P. 31:21-32:21).

20.     On April 12, 2017, Ahmed requested to meet with Plaintiff in order to review the results of the complaint to the Office of Student Life. (P. Dep. Ex. C; P. 38:21-39:19).

21.     Ahmed believed that Plaintiff was rude and argumentative in response to her request for a meeting. (P. Dep. Ex. C; P. 42:8-20).

22.     Ahmed counseled Plaintiff not to respond to any faculty member in this manner going forward. (P. Dep. Ex. C).

---

[4] References are to the exhibits introduced at Plaintiff's deposition.

23.     On or about April 19, 2017, NYIT notified Plaintiff that "the investigation did find that [he] engaged in inappropriate and offensive behaviors that would qualify as harassment and gender-based/sexual harassment if they were more severe or pervasive." (Pl. Dep. Ex. B).

24.     NYIT continued the no-contact order with the complaining students for the remainder of the academic year. (P. Dep. Ex. B).

**B.     Plaintiff's Grade Appeal**

25.     On May 11, 2017, Associate Professor and Academic Coordinator Corri Wolf ("Wolf") wrote to Ahmed about her interactions with Plaintiff on May 8, 2017 during which Plaintiff questioned his grade on an examination as he needed two additional points on the exam to increase his overall grade in the course. (Toren Aff., Ex. C [NYIT1654]).

26.     In her May 11, 2017 email, Wolf reported to Ahmed that: "[Plaintiff] argued multiple questions all of which his answer choices were incorrect. He refused to back down even when the rationale for each correct answer was shared. . . He refused to terminate the conversation regarding the cardiology test questions and kept arguing then he tried to argue pulmonary questions as well." (Toren Aff., Ex. C [NYIT1654]).

27.     Wolf also reported that after her discussion with Plaintiff, Plaintiff emailed Professor Michelle Damiani ("Damiani") concerning his examination grade. Wolf provided the email exchange between Plaintiff and Damiani to Ahmed. (Toren Aff., Ex. D [NYIT1655-1662]).

28.     In Plaintiff's email exchange with Damiani, he questioned the grading of his examination, noting that he needed to get one additional question correct in order to improve his course grade. (Toren Aff., Ex. D [NYIT1660-1662]).

29.     Plaintiff also made the request that Damiani: "Please keep this email only between me, you, and Dr. Venditto." (Toren Aff., Ex. D [NYIT1662]).

30.     In response, Damiani explained why Plaintiff's answers on the referenced questions were incorrect. (Toren Aff., Ex. D [NYIT1659-1660]).

31.     Plaintiff continued to challenge Damiani's explanations for the correct answers to the questions at issue and requested that Damiani: "Please consider accepting a few answers to some of these questions." (Toren Aff., Ex. D [NYIT1656-1662]).

32.     Plaintiff also informed Damiani that his current grade in the course "destroys my self-esteem." (Toren Aff., Ex. D [NYIT1656-1662]).

33.     On May 19, 2017, Plaintiff filed an appeal of what he claimed were three incorrectly graded test questions on an examination in the Clinical Medicine II course, as well as the calculation of his Endocrine quiz grade in the same course. (Pl. Dep. Ex. D; P. 49:7-52:14, 55:5-56:23).

34.     On May 23, 2017, Wolf denied Plaintiff's appeal and provided an explanation as to why Plaintiff's examination question responses were incorrect.  (Pl. Dep. Ex. D; P. 49:7-52:14).

35.     On May 24, 2017, Plaintiff appealed the matter to Ahmed as Chair of the Program. (Pl. Dep. Ex. D; P. 49:7-52:14).

36.     During a series of emails on May 25, 2017, Plaintiff claimed that his Clinical Medicine II grade was incorrectly calculated. (Pl. Dep. Ex. D; P. 49:7-52:14).

37.     Ahmed requested a meeting with Plaintiff to discuss his contention that his grade was incorrectly calculated. (Pl. Dep. Ex. D; P. 49:7-52:14).

38.     Plaintiff refused Ahmed's initial request to attend a meeting. (Pl. Dep. Ex. D; P. 49:7-52:14).

39.     On May 27, 2017, Plaintiff appealed his grade in Clinical Medicine II to Dean Sheldon Fields ("Dean Fields"), Dean of NYIT's School of Health Professions. (Toren Aff., Ex. E [NYIT1702-1736; Ahmed 57:8-13).

40.     On May 31, 2017, Dean Fields rejected Plaintiff's grade appeal. (Toren Aff., Ex. F [NYIT1749-1750]).

**C.     The May 24, 2017 Academic Standing Committee Meeting**

41.     As set forth in the Student Handbook, the Program has an Academic Standing Committee ("ASC") that assists the Program in dealing with student academic and disciplinary issues. (Toren Aff., Ex. A [NYIT964-967]).

42.     The ASC is comprised of Program faculty, as well as faculty from other programs. (Ahmed 40:5-18; Toren Aff., Ex. A [NYIT964-967]).

43.     During an ASC meeting, the student has the opportunity to provide an explanation concerning the academic and/or disciplinary matters that are the subject of the meeting. (Ahmed 40:5-18; Toren Aff., Ex. A [NYIT964-967]).

44.     The ASC then makes recommendations and provides guidance to the Chair of the Program regarding the academic and/or disciplinary matters that are the subject of the meeting. (Toren Aff., Ex. A [NYIT964-965]).

45.     Plaintiff met with the Program's ASC on May 24, 2017. (Pl. Dep. Ex. E; P. 59:15-22).

46.     Present at the meeting were Plaintiff and multiple faculty members, including Ahmed and David Jackson ("Jackson"), Plaintiff's faculty advisor. (Pl. Dep. Ex. E).

47.    The purpose of the meeting was to discuss certain incidents that academic year concerning Plaintiff's unprofessional behavior and interactions with faculty and students in the Program "which fell under the purview of professionalism and not academics." (Pl. Dep. Ex. E; P. 59:12-60:3).

48.    One matter discussed at the ASC meeting was Plaintiff's conduct during orientation after he arrived late to the activities and missed an examination. (Ahmed 50:21-52:11).

49.    The Program requested that Plaintiff take the examination at the end of the day's activities, while Plaintiff insisted on taking the examination upon arrival. (Ahmed 50:21-52:11).

50.    The ASC also discussed Plaintiff's communications with Wolf and Damiani in which he was argumentative concerning his examination and course grades. (Ahmed 56:6-17).

51.    Plaintiff did not disclose during the ASC meeting that he was anxious or was diagnosed with anxiety or any other psychological health condition. (P. 79:4-80:25, 83:20-84:3).

52.    Plaintiff referenced his stress levels at the ASC meeting and the ASC discussed Plaintiff's stress management. (P. 79:4-80:25; Ahmed 58:12-18; Pl. Dep. Ex. E).

53.    No NYIT employee made a reference to Plaintiff's psychological health during the ASC meeting. (P. 79:4-8).

54.    As of May 2017, Plaintiff had never received a diagnosis of any mental or psychiatric health condition. (P. 84:4-9).

55.    By letter, dated August 18, 2017, Ahmed notified Plaintiff of the recommendations of the ASC at the May 24, 2017 meeting.  (Pl. Dep. Ex. E; P. 58:5-59:9).

56.    The August 18, 2017 letter provides:

> The meeting was an opportunity to make you aware of the
> departments concerns of these patterns of behavior that had

become known and to give you an opportunity to present your side of the story to the ASC. . . The consensus and advice from the committee members was that you should reflect on your behavior and though your intent may not be to offend or harm, people may perceive your behavior quite differently.

After much discussion, it appeared that you were still not clear on many of the concerns the ASC had. However, you did state you felt your reaction to stress was an area you needed to work on and you stated you would be taking steps to do that over the summer months. We applaud you for that. Towards the end of the meeting, you did concede that you were in agreement with what the committee was recommending to you and these were:

> 1. That you need to reach out for help with managing your stress.

> 2. To work on being able to recognize that others may perceive your behavior differently and that this could lead to misunderstandings and even harm.

As a department and representatives of the PA profession, we have a responsibility to patients and the public to make sure that no student negatively affects the care of patients and the public when you are on your clinical rotations.

(Pl. Dep. Ex. E).

57. As a condition to continue in the Program, Plaintiff was also required to execute a Professional Behavioral Contract, which he did. (Pl. Dep. Ex. E; P. 95:24-96:9-22).

58. As part of the requirements of the Professional Behavior Contract, Plaintiff agreed to demonstrate professional written and verbal communications with faculty, students, preceptors, staff and patients during his tenure at the Program. (Pl. Dep. Ex. E; P. 95:24-96:9).

59. Plaintiff acknowledged his understanding that any violation of the Professional Behavior Contract could result in disciplinary action, including, but not limited to, dismissal from the Program. (Pl. Dep. Ex. E; P. 97:9-98:10).

### III. PLAINTIFF'S SECOND YEAR IN THE PROGRAM

**A.    The November 16, 2017 ASC Meeting**

60.    On November 9, 2017, Plaintiff was absent from Jackson's PHAS 650 Research I class. (Pl. Dep. Ex. H; P. 93:4-8).

61.    Plaintiff did not notify Jackson or Ahmed that he would be absent from class, as required by the Student Handbook. (Pl. Dep. Ex. H).

62.    Plaintiff took an examination in PHAS 621 Pharmacology II later that afternoon. (Pl. Dep. Ex. H; P. 100:13-23).

63.    The ASC met with Plaintiff on November 16, 2017 concerning his unexcused absence on November 9, 2017. (Pl. Dep. Ex. H; P. 103:9-14, 105:21-25; Ahmed 65:16-67:8).

64.    Plaintiff had the opportunity at the ASC meeting to explain the circumstances concerning his absence. (P. 106:2-20).

65.    The ASC issued its findings and recommendations on December 20, 2017. (Pl. Dep. Ex. H; P. 103:22-104:10).

66.    The ASC concluded that Plaintiff's conduct on November 9, 2017 violated the Program's absences policy in that he was absent from a class just prior to a scheduled examination in another class and that he failed to provide proper notice. (Pl. Dep. Ex. H).

67.    Plaintiff's absence resulted in his student peers not being able to present a team project. (Pl. Dep. Ex. H; P. 99:22-100:3; Ahmed 73:2-6).

68.    The ASC believed that Plaintiff's conduct also violated the Professional Behavioral Contract. (Pl. Dep. Ex. H).

69.    As set forth in the December 20, 2017 letter from Ahmed, "In light of these multiple incidents, the recommendation by the ASC to the Chair…was that you should be placed

on probation for the remainder of the time you are enrolled in the PA Studies Program." (Pl. Dep. Ex. H; Ahmed 77:6-19).

70.     Ahmed as Chair accepted the ASC's recommendation and placed Plaintiff on probation. (Pl. Dep. Ex. H; P. 109:8-9; Ahmed 78:24-80:20).

**B.     Plaintiff's Removal From Probation**

71.     In or about March 2018, Plaintiff contacted Yolany Gonell ("Gonell"), Director, Campus Life, about how to seek reconsideration of his current probationary status in the Program. (Pl. Dep. Ex. I; Ahmed 95:14-19).

72.     Gonell contacted Ahmed about Plaintiff's inquiry. (Pl. Dep. Ex. I).

73.     Gonell shared with Ahmed a letter from Plaintiff, dated April 4, 2018, requesting that the ASC remove him from probation and reinstate his good academic standing. (Pl. Dep. Ex. J; P. 112:3-114:6, 115:24-116:5; Ahmed 99:9-100:23).

74.     On May 3, 2018, Plaintiff met with Ahmed, Wolf, Plaintiff's new advisor, and Elizabeth DiNapoli ("DiNapoli"), Manager of Clinical Education. (Pl. Dep. Ex. K; P.120:11-17).

75.     During this meeting, Ahmed advised Plaintiff that the Program's faculty department decided that he would be removed from probation based on his efforts to address the prior concerns raised by the ASC. (Pl. Dep. Ex. K; P. 116:6-117:6; Ahmed 94:8-97:15).

76.     Plaintiff was provided with a written Student Encounter Form, dated May 3, 2018, concerning his meeting with Ahmed, Wolf and DiNapoli, which Plaintiff executed. (Pl. Dep. Ex. K; P. 118:12-19).

77.     The Student Encounter Form recounted DiNapoli's discussion with Plaintiff concerning the importance of remaining professional during the upcoming clinical clerkship year. (Pl. Dep. Ex. K).

78.     The Student Encounter Form also informed Plaintiff that "[a]ny complaint of unprofessional behavior while on Clinical rotations, would result in him being referred immediately to the Academic Standing Committee (ASC) of the program for investigation of the complaint and could result in his possible dismissal from the program."  (Pl. Dep. Ex. K; P. 120:18-122:16; Ahmed 97:10-15).

## IV.     PLAINTIFF'S CLINICAL CLERKSHIPS AND DISMISSAL FROM THE PROGRAM

### A.     Plaintiff's Dismissal From His Surgical Clinical Clerkship

79.     Plaintiff completed his family medicine clinical clerkship in Summer 2018. (P. 122:25-123:16).

80.     Plaintiff then commenced his surgical clinical clerkship at Long Island Jewish Medical Center ("LIJ"), located in New Hyde Park, New York, on or about July 31, 2018. (P. 123:17-125:9).

81.     On August 9, 2018, the Supervising Physician Assistant for Surgical Services at LIJ, Matthew L. Shebes, MHA, PA-C ("Shebes"), contacted DiNapoli to inform the Program about Plaintiff's unprofessional conduct that day. (Toren Aff., Ex. G [NYIT1803-1808]).

82.     The decision was made to send Plaintiff home from his surgical rotation that day. (Toren Aff., Ex. G [NYIT1803-1804]; P. 134:2-6).

83.     On August 10, 2018, Shebes spoke with Yennie Armand ("Armand"), Assistant Professor and Clinical Coordinator at the Program, and informed her of LIJ's decision to dismiss Plaintiff from his surgical clerkship. (Toren Aff., Ex. G [NYIT1803-1804]; Ahmed 103:2-9).

84. On August 13, 2018, Shebes provided a written description of Plaintiff's conduct that led to LIJ's decision to dismiss Plaintiff from his surgical clerkship. (Toren Aff., Ex. G [NYIT1803-1804]).

85. Shebes's description of the first encounter with Plaintiff is as follows:

> On Thursday 8/9/18, I was informed by Dr. Rafael Barrera, the director of The Surgical Intensive Care Unit that Elijah was at the bedside of a patient and was asked to hold an endotracheal tube while Dr. Barrera was performing a bronchoscopy. He was given explicit instructions on how to hold the tube. In spite of this, he was repositioning the tube to his own comfort. After Dr. Barrera repeated requests to hold the position in the correct way to keep the airway patent, Elijah's response was something to the effect of "but this was more comfortable for me". This is a direct threat to patient safety.

(Toren Aff., Ex. G [NYIT1803-1804]).

86. Shebes's description of the second encounter with Plaintiff is as follows:

> The second occurrence which was brought to my attention by the PGY-2 resident the Surgical ICU. The team was at a patient's bedside in the PACU where Elijah announced that he was going to take a requisite nap or "catch some Z's". He stated this was in preparation for his taking call. This was done within earshot of not only the SICU team but anybody else in the direct vicinity in the PACU. He then proceeded to excuse himself and was absent from the SICU for nearly 3.5 hours. This was in between the hours of approximately 12 and 3:30 P.M. I eventually found Elijah at about 3:40PM and asked him to come to my office. I asked him his rationale behind sleeping for 3 ½ hours in the middle of the day and one of the busiest times in the SICU. He stated that this was policy of his program that he had to get 4 hours of sleep during any 24-hour period on call. And those were the four hours that he chose. He didn't seem to comprehend that he took himself away from the SICU during a peak time of the day. In addition, while I was speaking with him, at ~3:45PM an alarm sounded on his cellphone. He responded that that was his "wake up alarm".

(Toren Aff., Ex. G [NYIT1803-1804]).

87.     In his email, Shebes also provided feedback from Plaintiff's primary preceptor who noted that Plaintiff's interactions with other LIJ employees were "unprofessional" and that he "seemed disinterested." (Toren Aff., Ex. G [NYIT1803-1804]).

88.     On August 13, 2018, Ahmed and Armand met with Plaintiff concerning his dismissal from his surgical clerkship at LIJ. (Pl. Dep. Ex. M; P. 126:10-18; Ahmed 104:9-12).

89.     At the meeting, Plaintiff was informed of LIJ's reasons for its decision to dismiss him from the clerkship. (Pl. Dep. Ex. M; P. 126:20-25).

90.     Plaintiff was also informed that he was being placed on an interim suspension while the Program gathered additional information. (Pl. Dep. Ex. M; P. 134:20-135:2).

91.     Plaintiff signed on acknowledgement concerning what was discussed at the August 13, 2018 meeting. (Pl. Dep. Ex. M; P. 127:2-12).

92.     On August 16, 2018, Ahmed and Armand met with Plaintiff for a second time concerning his dismissal from his surgical clerkship at LIJ. (Pl. Dep. Ex. N; P. 136:22-137:5; Ahmed 104:9-12).

93.     Plaintiff acknowledged what was discussed at the August 16, 2018 meeting in a memorandum. (Pl. Dep. Ex. N; P. 136:3-137:6, 138:14-20).

94.     During the August 16, 2018 meeting, Plaintiff was permitted to share his version of the events that occurred at LIJ on August 9, 2018. (Pl. Dep. Ex. N; P. 137:9-22).

95.     Plaintiff was informed that he remained on interim suspension pending further investigation of the events that led to his dismissal from LIJ. (Pl. Dep. Ex. N).

96.     Ahmed explained to Plaintiff that there were two possible outcomes from his dismissal from LIJ: (1) repeating his surgical clerkship at another institution and being placed on

probation for the duration of this clinical year; or (2) dismissal from the Program. (Pl. Dep. Ex. N; P. 137:17-138:13).

97.    As part of the Program's investigation, Ahmed and Armand spoke with LIJ again concerning Plaintiff's performance during the clerkship. (Toren Aff., Ex. H [NYIT1844]; Ahmed 103:15-104:16).

**B.    The August 30, 2018 ASC Meeting and Emergency Suspension**

98.    An ASC meeting was held on August 30, 2018 concerning Plaintiff's dismissal from his surgical clerkship at LIJ. (Pl. Dep. Ex. R; P.140:16-23, 142:18-143:6; Ahmed 101:18-102:19).

99.    Plaintiff was present at the ASC meeting and was permitted to share his version of the events at LIJ to the committee members. (Pl. Dep. Ex. R; P. 143:13-144:10).

100.    At the ASC meeting, Plaintiff expressed that he felt depressed and devastated surrounding his dismissal from LIJ and suspension from the Program. (Pl. Dep. Ex. R; P.144:11-145:9, 154:22-155:3; Ahmed 115:20-118:6; Ahmed Dep. Ex.[5] 9).

101.    Based on Plaintiff's comments during the ASC meeting and out of concern for Plaintiff's safety and the safety of others, on August 31, 2018, Ahmed, on behalf of the ASC, requested a Behavioral Intervention Team ("BIT") assessment for Plaintiff. (Ahmed 115:20-118:6; Ahmed Dep. Ex. 9).

102.    Ahmed made this request to Gabrielle St. Leger ("St. Leger"), NYIT's Dean of Students, and Cason Brunt ("Brunt"), NYIT's Associate Dean, Student Life via email. (Ahmed 115:20-118:6; Ahmed Dep. Ex. 9).

---

[5] References are to the exhibits introduced at Ahmed's deposition.

103.     A threat assessment conference call was held with Ahmed, St. Leger, Brunt and others on August 31, 2018. (Ahmed 118:12-120:15).

104.     The BIT concluded that Plaintiff should be placed on emergency suspension from NYIT. (Pl. Dep. Ex. P).

105.     As confirmed by St. Leger in her August 31, 2018 email:

> As we concluded from the Threat Assessment conference call, and upon further review of the concerns of the professional staff at Northwell, the concerns of the student's behavior and lack of concern for the safety of the patients under his care lead the group rises to the level of requiring an emergency suspension to take effect immediately.

(Toren Aff., Ex. I [NYIT1907]; Ahmed 124:12-126:26).

106.     On September 3, 2018, St. Leger notified Plaintiff of the decision to place Plaintiff on emergency suspension from NYIT effective immediately. (Pl. Dep. Ex. P; P.141:4-24).

107.     St. Leger's September 3, 2018 letter to Plaintiff provides:

> This Emergency Suspension is an action that may be taken in accordance with the NYIT Student Handbook Code of Conduct…in situations where there is reasonable cause to believe a student's alleged behavior or action and/or continued presence at the institution poses a clear and present danger to the health, safety, or general welfare of individuals, the campus community, continuance of NYIT functions or NYIT property.

(Pl. Dep. Ex. P).

108.     Plaintiff was notified that in order for the suspension to be lifted, he would need to undergo an evaluation by a psychiatrist "to determine whether it is advisable for [Plaintiff] to return to campus and participate in college coursework…" The psychiatrist would also need to "include the information that [Plaintiff] do[es] not pose a danger to individuals or the campus community." (Pl. Dep. Ex. P; P. 145:10-16; Ahmed 123:22-25).

109.    At Plaintiff's request, NYIT assisted Plaintiff with finding a psychiatrist to conduct the required evaluation. (Pl. Dep. Ex. Q; P. 147:11-148:3).

110.    On September 8, 2018, Ahmed notified Plaintiff of the ASC's concerns and recommendations based on the August 30, 2018 ASC meeting. (Pl. Dep. Ex. R; P. 149:14-150:13).

111.    One of the ASC's concerns was that Plaintiff's "repeated actions demonstrate an over inflated sense of autonomy in situations in which he should be functioning under direct supervision and guidance. This false sense of independence has led to poor/absent communication to his superiors and unprofessional conduct…" (Pl. Dep. Ex. R).

112.    The ASC noted that Plaintiff's conduct "could potentially put a patient at risk." (Pl. Dep. Ex. R).

113.    The ASC made three recommendations based on Plaintiff's conduct. (Pl. Dep. Ex. R).

114.    The first recommendation by the ASC was for Plaintiff to "consider meeting with NYIT's Counseling & Wellness Department regarding his expressed feelings of depression and external stresses for support and counseling." (Pl. Dep. Ex. R)

115.    The second recommendation by the ASC was for Plaintiff to be placed on probation until satisfactory completion of all clinical clerkships. (Pl. Dep. Ex. R).

116.    The third recommendation by the ASC was that prior to returning to clinical clerkships Plaintiff "should be exposed to scenarios within a simulated setting that places him in specific cases where he must demonstrate that he can take direct commands and constructive criticism from supervisory personnel." (Pl. Dep. Ex. R).

117.    Ahmed noted her agreement with the ASC's recommendations. (Pl. Dep. Ex. R).

118. Ahmed informed Plaintiff that: "If you are dismissed from any clinical site for any reason, you will be immediately dismissed from the program. No further hearings or ASC meetings will be convened." (Pl. Dep. Ex. R).

119. Ahmed met with Plaintiff on September 13, 2018, who acknowledged his understanding of the contents of the September 8, 2018 letter. (Pl. Dep. Ex. R; P. 150:10-13).

120. Plaintiff also met with the Institute of Clinical Competence ("ICC") on September 13, 2018 to participate in various simulations as recommended by the ASC and Ahmed. (Toren Aff., Ex. J [NYIT1976]; P. 156:13-25.

121. In accordance with the requirements of the BIT to return to NYIT, Plaintiff met with Michael Sanders, M.D., a psychiatrist, on September 11 and 13, 2018. (Pl. Dep. Ex. S; P. 163:2-15).

122. Dr. Sanders provided St. Leger with a completed Treatment Provider Report Form and a letter, dated September 13, 2018. (Pl. Dep. Ex. S; P. 160:20-25).

123. In the Treatment Provider Report Form, Dr. Sanders noted that Plaintiff was "presenting symptoms" of "anxiety disorder." (Pl. Dep. Ex. S).

124. The Treatment Provider Report Form does not identify a medical diagnosis for Plaintiff. (Pl. Dep. Ex. S).

125. In the September 13, 2018 letter, Dr. Sanders informed NYIT that Plaintiff: "can safely return to his studies without limitation. He poses no risk to himself, to patients or to fellow students." (Exhibit S; P. 163:16-164:4; Ahmed 126:17-127:15).

126. On September 17, 2018, Brunt notified Plaintiff that he was approved to return to NYIT from his emergency suspension. (Pl. Dep. Ex. T; P. 157:23-158:6, 164:5-166:15).

127.    On September 18, 2018, Ahmed, Wolf and Armand met with Plaintiff to review the feedback from Plaintiff's participation in the ICC simulations prior to his return to the Program. (Pl. Dep. Ex. U; P. 168:16-169:5).

128.    Plaintiff was provided a letter, dated September 18, 2018, that reiterated the requirements and recommendations of the Program in order to graduate. (Pl. Dep. Ex. U; P. 172:16-23).

129.    Plaintiff acknowledged his understanding of the contents of the September 18, 2018 letter. P. 168:25-169:5; Pl. Dep. Ex. U).

130.    The September 18, 2018 letter confirmed that Plaintiff had to repeat his surgical clerkship. (Pl. Dep. Ex. U; P. 172:24-173:2).

131.    The September 18, 2018 letter confirmed that Plaintiff would be "on probation (which covers both academic and professional issues) until [Plaintiff] ha[s] satisfactorily competed all clinical clerkships and requirements for graduation by the program and NYIT." (Pl. Dep. Ex. U; P. 173:5-12).

132.    The September 18, 2018 letter informed Plaintiff that: "Any further breach of academic or professional conduct as expected and described in the student handbook or senior orientation manual…will result in your immediate dismissal." (Pl. Dep. Ex. U; P. 173:13-23).

133.    The September 18, 2018 letter informed Plaintiff that: "[d]ismissal from any clinical site for any reason will result in immediate dismissal from the program" and that the Program "will convene no further hearings or ASC meetings." (Pl. Dep. Ex. U; P. 174:2-15, 175:15-19).

**C.**   **Plaintiff's Dismissal From the Pediatric Clinical Clerkship and the Program**

134.   Upon reinstatement to the Program, Plaintiff completed his internal medicine clinical clerkship. (P. 175:20-25, 178:21-24).

135.   Plaintiff was assigned to complete his pediatrics clinical clerkship at Pediatric Health Care of Queens, P.C. (Toren Aff., Ex. K [NYIT1996-1998]; P. 179:3-180:2).

136.   On November 29, 2018, Dr. Demetrios Markouizos, Plaintiff's preceptor at his pediatric clerkship, spoke with Ahmed and Armand about concerns he and his colleague had about Plaintiff's performance. (Toren Aff., Ex. L [NYIT544]; Toren Aff., Ex. M [NYIT2008-2009]; Ahmed 146:10-147:15).

137.   They reported that Plaintiff had given patients misinformation and that he went into patient care rooms without a physician present, in direct contradiction to their instructions. (Ahmed 150:21-152:23; Toren Aff., Ex. M [NYIT544]).

138.   On November 30, 2018, the Program received Plaintiff's Mid-Rotation Clerkship Evaluation Form from Dr. Markouizos. (Toren Aff., Ex. K [NYIT1996-1998]; Ahmed 152:5-9, 162:11-163:2).

139.   In the evaluation, Dr. Markouizos scored Plaintiff with a "1", the lowest possible score, in three of nine categories that he evaluated, including: "Attitude/Professionalism (cooperation, punctuality, receptivity to feedback)," "Ability to work well with others," and "Acceptance of constructive criticism." (Toren Aff., Ex. K [NYIT1997]).

140.   In the evaluation, Dr. Markouizos scored Plaintiff with a "2," the second lowest possible score, in three of nine categories that he evaluated. (Toren Aff., Ex. K [NYIT1997]).

141.     In light of Plaintiff's performance issues as reported by the clinical site on the phone and in the evaluation, Ahmed and Armand made the decision to dismiss Plaintiff from the pediatric clerkship. (Toren Aff., Ex. M [NYIT2008]; Pl. Dep. Ex. W; Ahmed 147:24-148-12).

142.     On November 30, 2018, Armand emailed Plaintiff to acknowledge receipt of Dr. Markouizos's evaluation and noted that she found it to be "troubling." (Pl. Dep. Ex. W).

143.     Armand notified Plaintiff in her November 30, 2018 email that he was being removed from his pediatric clerkship. (Pl. Dep. Ex. W; P. 183:5-23).

144.     Armand specifically directed Plaintiff not to report to Dr. Markouizos's office or to contact him or anyone in his office. (Pl. Dep. Ex. W; P. 184:7-22).

145.     On December 4, 2018, the Program department faculty met to discuss Plaintiff. The decision was made to dismiss Plaintiff from the Program based on his history of unprofessional behavior culminating in the concerns raised by the pediatric clerkship site. (Toren Aff., Ex. M [NYIT2008]; Ahmed 153:15-154:8).

146.     On December 4, 2018, Dr. Markouizos called Ahmed and notified her that Plaintiff tried to "break into his clinic" at approximately 5pm. (Toren Aff., Ex. M [NYIT2008]; Ahmed 163:16-164:18).

147.     On December 4, 2018, Plaintiff returned to the building that housed Dr. Markouizos's office in order to retrieve his lab coat. (P. 184:18-186:3).

148.     On December 6, 2018, Ahmed met with Plaintiff in the presence of St. Leger and NYIT's Senior Director, Facilities Operations and Security, and informed Plaintiff of his dismissal from the Program. (Toren Aff., Ex. N [NYIT2024].

149.     Ahmed also provided to Plaintiff a letter, dated December 6, 2018, confirming his dismissal from the Program. (Pl. Dep. Ex. Z; Toren Aff., Ex. N [NYIT2024]; P. 191:18-192:22).

150.    In the December 6, 2018 letter, Ahmed noted that the clinical coordinating team had dismissed Plaintiff from his pediatric clerkship "based upon [Plaintiff's] failure to conduct [himself] in a professional manner during the course of the rotation." (Pl. Dep. Ex. Z).

151.    Ahmed noted that Plaintiff's conduct and dismissal from the clerkship violated two conditions set forth in the September 18, 2018 letter:

> #4. Any further breach of academic or professional conduct as expected and described in the student handbook or senior orientational manual (Clinical Clerkship Handbook) will result in your immediate dismissal.
>
> #5. Dismissal from any clinical site for any reason will result in immediate dismissal from the program.

(Pl. Dep. Ex. Z).

152.    Plaintiff is not aware of any student being dismissed from two clinical clerkships. (P. 187:11-188:8).

153.    Plaintiff never heard any NYIT employees make any critical remarks about people who are disabled. (P. 209:10-13).

154.    Plaintiff could not recall Ahmed making any statements that led Plaintiff to believe that Ahmed was prejudiced against people with anxiety. (P. 212:13-24).

155.    Jackson was not involved with the decision to dismiss Plaintiff from the Program as he was no longer a NYIT faculty member in December 2018. (Ahmed 25:12-24).

Dated: New York, New York
       March 15, 2023

                                   Respectfully Submitted,

                                   CLIFTON BUDD & DeMARIA, LLP
                                   *Attorneys for Defendant NYIT*

                                   *Stefanie Toren*

                        By: _____
                                   Douglas P. Catalano
                                   Stefanie R. Toren
                                   Stephen P. Pischl
                                   350 Fifth Avenue, 61st Floor
                                   New York, New York 10118
                                   Phone: (212) 687-7410
                                   Facsimile: (212) 687-3285
                                   dpcatalano@cbdm.com
                                   srtoren@cbdm.com
                                   sppischl@cbdm.com